[No. 11979. Department One. September 16, 1914.]

## ROBERT E. ROGERS, *Respondent*, v. MAGGIE ROGERS, *Appellant*.[1]

APPEAL—REVIEW—FINDINGS. Findings upon conflicting evidence in an action for divorce will not be disturbed on appeal, where it cannot be said that the findings are not sustained by a fair preponderance of the evidence.

DIVORCE—DEFENSES—RECRIMINATION—CONDONATION OF OFFENSES—EVIDENCE—SUFFICIENCY. In an action for divorce, the evidence is sufficient to show that matters pleaded in recrimination were condoned by defendant, where it appeared that, after abstracting certain letters from plaintiff's pocket written to him by certain women, one of which implied criminal intimacy with the writer, defendant continued to live with plaintiff and subsequently bore him another child; and other matters testified to by defendant as constituting misconduct on the part of plaintiff, were only capable of such inference by interpreting them in the light of her own construction.

DIVORCE—MISCONDUCT—CONDONATION OF OFFENSE. Condonation being a forgiveness with an implied condition that the offense shall not be repeated, misconduct of a party, long since condoned, will not be removed lightly or upon proof of slight delinquency, where set up as a recriminatory bar in a subsequent action for divorce brought by the offending party.

Appeal from a judgment of the superior court for Spokane county, Kennan, J., entered November 24, 1913, upon findings in favor of the plaintiff, after a trial on the merits before the court without a jury, in an action for divorce. Affirmed.

[1]Reported in 142 Pac. 1150.

*Nuzum, Clark & Nuzum* (*George H. Armitage,* of counsel), for appellant.

*Merritt, Oswald & Merritt,* for respondent.

ELLIS, J.—This is an action for divorce. The complaint set up facts tending to establish the statutory ground of cruelty on the part of the defendant, consisting of abusive language, neglect of wifely duty, occupying a separate room, refusing to cohabit with the husband since the year 1908, refusing to speak to him for months at a time, and then only to interfere with his attempts to control their son Robert, fifteen years old; neglect of plaintiff and failure to care for him during two severe illnesses. The answer denied the allegations of the complaint, and set up, by way of an affirmative defense and matter in recrimination, that the plaintiff has disregarded his marriage vows and has associated with lewd women; that the defendant has, from time to time, forgiven him, on promises of reformation; that she believes the plaintiff is infatuated with some other woman and that he will eventually see his error and reunite with her in the making of a home, and prays that no divorce be granted. The reply was a traverse of the affirmative matters pleaded in recrimination.

There are two childern the result of the marriage, a son now twenty-four years old and self-supporting, and a son now fifteen years old, who is in school. After a lengthy trial, in which the whole marital life of the parties was covered by the evidence, the court found, in substance, that the plaintiff is employed by the Northern Pacific Railway Company at a net salary of $164 a month, has no other income, and the only property owned by the parties, community or separate, is a residence and $325 in money; that the plaintiff's father is eighty-three years old, unable to earn a living, has no income, and plaintiff is compelled to support his father and stepmother out of his salary; that plaintiff and defendant were married at Helena, Montana, in March, 1886, resided

there and at Missoula, Montana, until 1902, when they moved to Spokane, Washington; that about April, 1908, they had an altercation touching their eldest son, Frank, and, since that time, they have not cohabited together, but lived in the same house, occupying separate rooms until July, 1913, when plaintiff left, and that they have since lived separate and apart; that certain letters in evidence, produced by the defendant, were written to the plaintiff more than seventeen years ago, and after that time, with full knowledge on her part, defendant and plaintiff lived together and cohabited as husband and wife until 1908; that whatever may have been the right of the defendant by reason of these letters, plaintiff's conduct in that regard had been condoned prior to the time the parties ceased to live together as husband and wife; that the defendant has unreasonable and narrow ideas as to the proper action of her husband, has criticised his talking with woman acquaintances in her presence and the presence of others, has treated the plaintiff cruelly by continuously nagging him, and objecting to his having, at any time, or under circumstances however proper, met or spoken to any woman in the presence of the defendant or otherwise, and would require her husband to conduct himself in a way unreasonable and unnecessary, and that such action and nagging conduct constitutes cruel treatment to such extent that the plaintiff should not be required to live with her; that since the altercation in 1908, defendant has manifested no love or affection for the plaintiff; has nagged and cruelly mistreated him to such an extent as to interfere with his peace of mind so that a continuance thereof would interfere with his duties to the railway company; that, except as evidenced by the letters referred to, written more than seventeen years ago, there is nothing in the plaintiff's conduct justifying the defendant in her nagging conduct toward him; that since that time, up to July, 1913, while he resided in the same house, there was no reason why she should not have

ceased her nagging, abuse and mistreatment of the plaintiff, and that he was justified in leaving.

Upon appropriate conclusions of law, the court entered a decree divorcing the parties, awarding to defendant the home and household goods, the custody of the minor son, Robert, and a monthly alimony of $50, and $50 attorney's fee, and awarding to the plaintiff the money in the bank, a motor boat, and certain strictly personal effects. From this decree, the defendant appeals.

The appellant's argument is directed to two principal contentions: (1) That the respondent's evidence, independently of any consideration of the matter in recrimination, was insufficient to sustain the findings of fact and insufficient to warrant a decree of divorce on the ground of cruelty; (2) that, in any event, the court erred in finding that the matters pleaded and proved by way of recrimination had been condoned by the appellant.

(1) In a hotly contested action for divorce, such as this, wherein the differences, bickerings and mutual criticisms of years have culminated in a final fixed attitude of mutual animosity, the strongest personal feelings of the parties are profoundly stirred. Their testimony, to which, of necessity, resort for the truth must, in the main, be had, is usually directly conflicting and colored, not alone by fancied self-interest, but by the accumulated bitterness of years. In such a case, it is obvious that the reader of the written record of their testimony is at a marked disadvantage as compared with the trial judge who heard it, in the effort to arrive at the actual truth of the situation and meet it with even justice to the paries, and at the same time conserve the best interests of the children and of society. We have, therefore, frequently announced that, though in a divorce suit the trial here is one *de novo*, the findings of the trial court upon conflicting evidence are entitled to great weight. We are in no position to pass upon the credibility of the witnesses. *Brogna*

*v. Brogna*, 67 Wash. 687, 122 Pac. 1; *Hale v. Hale*, 76 Wash. 34, 135 Pac. 481.

"In cases of this kind there is often an atmosphere apparent at the trial, sometimes elusive, but none the less palpable to the trial court, which is seldom fully manifested in the written record." *Dyer v. Dyer*, 65 Wash. 535, 538, 118 Pac. 634.

We have not only read the abstract of record, but, in large part, the statement of facts itself. Any effort to discuss the evidence in detail would be but a lengthy recital of a distressing story of unreasoning jealousy and distrust on the one hand, and of final exasperated indifference on the other, induced thereby. Such a discussion would not affect the result, but would only extend this opinion, to no possible profit. Any one reading the record could hardly fail to lay it down with the distinct conviction that whatever the grounds in past years for the appellant's jealousy, she has nursed it to such proportions that the respondent's assumed infidelity has become a fixed idea which nothing can eradicate. It is clearly as torturing to her as it is exasperating to him. It can hardly be doubted that her own happiness and peace of mind will be as much subserved by a divorce as will his. The evidence presents the conflict usual in such cases upon every issue of fact. We cannot say that the court's findings, so far as they relate to pure questions of fact, are not sustained by a fair preponderance of the evidence. Independently of the matter advanced in recrimination, the decree is clearly sustained by the evidence.

(2) The only real evidence of the matters pleaded in recrimination rests in certain letters which the appellant abstracted from the respondent's pocket in 1893 and 1896, purporting to have been written to him by certain women, one of which at least implied that the respondent and the writer of the letter had been guilty of criminal intimacy. Unquestionably, had the appellant then sought a divorce, these letters would have furnished *prima facie* proof of such miscon-

duct as to sustain a decree in her favor. She brought no such action, and, so far as we are advised, threatened none. On the contrary, she continued to live with the respondent, and subsequently bore him a second son. In 1910, after the time when the court found she had ceased to cohabit with the respondent, she intercepted another letter from a woman whom both parties had met at the home of respondent's father in Coeur d'Alene, Idaho. This letter, it is admitted, never reached the respondent. It was a brief note, stating that the respondent had asked the woman to call upon him when she came to Spokane, but had not told her where to find him. It gave the information that she would not work the following Monday, and gave her address. There was no evidence that he ever wrote to, or saw, the woman afterwards, and he positively denied anything more than a passing acquaintance with her. The appellant testified to many other actions during the past seventeen years which she regarded as indicating a continuing lascivious disposition on the respondent's part, but, in order to be capable of this inference, they must be interpreted largely, if not wholly, in the light of her own construction. She said, "I wouldn't think he was doing the right thing if he spoke to any woman that I didn't take into my circle."

The appellant's contention, if we have correctly caught counsel's meaning, is that condonation can never be invoked as against matters pleaded in recrimination, but only where the conduct condoned is made the basis of an action for divorce by the condoning party. It is true, as argued by appellant, that a party who comes into court seeking a divorce is subject to the maxim that "he who comes into equity must come with clean hands," and it is true that the doctrine of recrimination is based upon this principle, and that it is held that a plaintiff is not entitled to relief, in that he does not come with clean hands, where he has provoked the injury of which he complains, or where he is guilty of marital misconduct of equal gravity. 1 Nelson, Divorce & Separation,

§ 425. These applications of this maxim, however, as the basis of recrimination, are no more inconsistent with the application of the doctrine of condonation than the same maxim would be as applied to an action by the plaintiff, setting up condoned misconduct of the defendant as the sole ground for divorce. Bishop defines condonation as follows:

"Condonation is the remission, by one of the married parties, of an offence which he knows the other has committed against the marriage, on the condition of being continually afterward treated by the other with conjugal kindness—resulting in the rule that while the condition remains unbroken there can be no divorce, but a breach of it revives the original remedy." 2 Bishop, Marriage, Divorce & Separation, § 269.

In a recent case, we have defined condonation in practically the same way:

"Condonation is forgiveness with an implied condition that the injury shall not be repeated, and on breach of this condition the right to a remedy for former injuries revives." *Averbuch v. Averbuch*, 80 Wash. 257, 141 Pac. 701.

The doctrine of condonation is based upon a sound public policy which would not only discourage divorce, but also discourage improper conduct on the part of the parties. It puts a premium upon reformation by holding the forgiving party in good faith to the forgiveness so long as the offending party observes a correct course of conduct. If a condoned offense could at any future time be set up as a recriminatory bar to an action for divorce by the other party, it would have a tendency to remove all restraint from the conduct of the forgiving party, which would be contrary to the very reasons of public policy underlying the whole doctrine of condonation. Expressed in terms of contract, condonation is a barter of permanent forgiveness on the one hand for continual good behavior on the other. It was never intended as a barter of forgiveness for an immunity of the forgiving party from the consequences of his own or her own future marital delinquencies. Yet if a condoned offense may be set up in bar of an action for divorce against the forgiving party, the lat-

ter would be the plain effect of the condonation. After reviewing many authorities, Bishop clearly states the logically resulting principle as follows:

"When a matrimonial offence is condoned, the party forgiven stands upright as to the other party, so long as he commits no breach of the condition on which all condonations proceed. This places the one forgiving under no new liberty to do evil; but if the condoned offence still operates as a recriminatory bar, the forgiving party practically obtained a license for himself when suffering the condonation to pass. And surely any construction of either a common law or a statutory rule, the effect of which is to license profligacy, or other ill conduct in the matrimonial relation, is to be avoided. Hence, in principle, a condoned offence is not an adequate bar in recrimination." 2 Bishop, Marriage, Divorce & Separation, § 405.

We do not want to be understood as holding that a condoned offense may not be revived by subsequent misconduct of the forgiven party so as to be capable of being invoked as a defense by way of recrimination as well as a defense to an action for divorce for the condoned offense itself. Nor do we hold that the reviving misconduct must in itself and by itself be such as to constitute independent ground for divorce. To so hold would deprive revival of all practical utility. We do hold, however, that condonation will not be removed lightly or on proof of slight delinquency, nor on proof of facts warranting nothing more than a vague suspicion of subsequent wrongdoing. To hold otherwise would deprive condonation of every substantial benefit. The evidence in the case before us, to our minds, falls far short of presenting sufficient grounds for the revival of offenses clearly condoned by the appellant for seventeen years.

The forgiveness, which is the very essence of condonation, must be a real forgiveness. If the condoned offense is permitted to answer as an adequate and perennial excuse in law for years of yielding to jealousy, torturing and intolerable alike to both parties, then condonation is not real forgive-

ness, but a mere colorable counterfeit, binding the speciously forgiven party to a never ending castigation for ancient offenses, creating an atmosphere inimical alike to the happiness of the parties and that of their children.

The language used in two cases cited by the appellant is broad enough to sustain the claim that jealousy initiated by a plaintiff's own misconduct can never be the basis of an action on his part for a divorce. The facts in these cases were widely different from those here presented. The language, we apprehend, was not intended as expressing a broad, unvarying principle, but only as applicable to the facts there presented or to cognate facts. In both cases the conduct of the husband, apparently continuing up to the time of the crisis, was such as to attract general attention and to provoke gossip and adverse comment. *Spofford v. Spofford*, 18 Idaho 115, 108 Pac. 1054; *Masterman v. Masterman*, 58 Kan. 748, 51 Pac. 277. We have been cited to nothing of that kind in the record here.

The decree is affirmed.

CROW, C. J., GOSE, CHADWICK, and MAIN, JJ., concur.